Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning. We have four appeals to hear this morning. I know that at least in some of these appeals several issues are raised and with the counsel you should feel free to get straight to the heart of your argument, the most important parts of your argument. We've read your briefs, the authorities cited in your briefs, and at least portions of the record so we're familiar with the case. You don't need to give us background information when you begin. You can assume that we're familiar with the issues and anything you're not able to address we will of course still have under submission that so long as that issue was raised in the briefs. So we have four cases. We're going to begin this morning with Regions Bank v. Kaplan. Mr. Perkins. Good morning, Your Honors. May it please the court, Joe Perkins on behalf of Regions Bank. We have reserved three minutes for reply and my argument will focus on the points in Regions initial brief appeal of the final judgment and we rest on the briefs in connection with the Croft Appeal and the consolidated sanctions appeal. Your Honors, this is a case where reversal is appropriate because in the face of a mountain of evidence the court made four findings that did not have a bearing on the case or Regions claims and use those findings to credit Mr. Kaplan's mere denials at trial. The first of those findings was that Mr. Kaplan did not directly contact Bridgeview Bank to induce payments of the Smith advertising checks drawn on the Smith advertising account at that bank. But check cutting does not require a party to call the other bank and ask the bank to cover the checks. It was uncontradicted below that Mr. Kaplan's on 29 out of 30 days of the kite period were necessary to enable Bridgeview to honor the checks. The second question that the court answered but had no bearing on the case was the court's crediting Mr. Kaplan's mere denials that he did not know the specific balances of the Bridgeview account at any given time. But knowledge of specific balances is unnecessary and as the Spidey's case that we cited holds Judge Kugler discussed how constructive knowledge alone that checks are NSF upon deposit equals fraudulent presentment. Meanwhile Regions presented overwhelming evidence that Mr. Kaplan had actual if not constructive knowledge that the checks he was depositing were NSF. The court ignored Mr. Kaplan's own testimony that it was his understanding that the very predicate of these bundled deals was insufficient funds in the Smith advertising bank account. The court acknowledged but ignored the first email from Todd Smith that explained the logic of the so-called bundle deals. The Smith explained that if he had the money to do these deals on his own he would do it. The court ignored the Thursday December 2nd 2011 email that email that Mr. Smith sent to Marvin Kaplan in connection with the first kite rotation where Mr. Smith explained very expressly that on a Thursday I will mail you the checks you deposit the checks Friday morning my customers payment will not post until midnight Friday which really means Monday and Mr. Kaplan himself testified that he understood that posting of a check does not mean clear you have to wait for a check to clear after it posts. The court also found in its trial findings that Mr. Kaplan understood the check collection process. He understood that Regions was providing provisional credit for these He understood what float time meant for collecting checks. He understood that Regions would not know that checks were dishonored until Bridgeview Bank determined not to pay them and notified Regions of that fact. Regions presented evidence that Mr. Kaplan himself when this kite collapsed admitted that the purpose of using checks in these wires for checks exchanges was to leverage the admission that Mr. Kaplan himself does not to know. Hi this is Robert Lutz. Let me ask you a question. If for some reason let's assume for the moment that this was a legitimate that what Smith Advertising was doing was legitimate in fact that there were these contracts that were bundled or contracts that they were trying to exploit the discount for I know it wasn't but assume that for me for a moment and let's assume for the moment that Mr. Kaplan believed that to be the case that there were actually discounts and that he was receiving that. Would this be a check kite if everything else was the same? Yes yes it would it would certainly be fraudulent concealment and there are two cases that stand for that proposition. One is the Skidoo case where it's not the depositing of the NSF checks that resulted in fraud upon presentment. The other is a decision of this court in Morales where again the hope that the depositing of NSF checks hoping for future funds hoping for Mr. Perkins my hypothetical is more than just hoping. I understand the propositions that you're arguing but but assuming that this was real and that at least for eight years while this was going on that there there had been these discounts that had been exploited for for for prompt payment or for immediate payment and that that discount was split and that Mr. Kaplan had an eight-year history of benefiting from that and assuming that that was actually true and was in fact happening including with the bundles this is more than a hope for this is this is they know that they are going to cover whatever the short-term spread is in the Bridge Review account right? That's not correct for two reasons. First it's very important to distinguish the check collection issues with the bundle deals where Mr. Kaplan was sending wires and depositing. I know you make that argument but why can't the trial court and its findings credit the testimony of Mr. Kaplan that for eight years he had had this business relationship with Smith he believed that what they are doing was legitimate and he didn't see how and because of that he believed that what was going on with the bundling was also legitimate. Why can't the trial court credit that? Because even if Mr. Kaplan believed that the Smith end of the print contract transactions was legitimate Regents presented a mountain of evidence that Mr. Kaplan knew he was depositing NSF checks hoping that future again assuming that Mr. Kaplan sincerely believed that the Smith advertising end of the transaction was true even the hope that future payments from the customers of Smith into the Bridge Review Bank account would cover the NSF checks that Mr. Kaplan was depositing that is wrong under the Morales case. Yeah but again there seems to be a difference between hoping and which I understand meaning you know I think this is going to all work out but I don't really know versus I believe and I know based on a significant experience with this company that there is no NSF and there is no fraud and no cover because no check had been declined or sent return to maker or not sufficient funds for the eight-year relationship. Well no for the entire relationship other than the last portion of the kite period the 30 days Mr. Kaplan waited at minimum 15 days to deposit the principal repayment checks usually waited 30 to 60 days. The circular rotation of checks for wires is something that was brand new that was completely new and only started during the kite period and the fact that there were no check collection issues during the kite period it happened because by definition there was a check kite and at the end it collapsed. So even if we gave Mr. Kaplan a sincere belief of the Smith advertising of the transactions which by the way the evidence was that Mr. Kaplan deposited loan repayment principal checks before even funding the certain instances that still doesn't change the fact that Mr. Kaplan as he admitted was leveraging the check float he was putting Regions Bank at risk to invest in whatever he believed to be occurring with Smith advertising and that gives rise to a duty to disclose because if Mr. Kaplan had told the bank I'm going to deposit NSF checks in these accounts if Mr. Kaplan had told the bank I am doing business whereby I am by design leveraging the check float then Regions would have shut it down just like it did on January 25th when Mr. Kaplan admitted it. And Judge Luck you know another point is the predicate for these deals was insufficient funds in a Smith advertising account so you had asked well why couldn't Mr. Kaplan believe that these checks were supported by sufficient funds because he had a history with Todd Smith and Smith advertising but Mr. Smith told Mr. Kaplan that when I have the money in my account to do this I do it myself I reach out to you when there is not enough money to do this when I don't have the money to do this and Mr. Kaplan admitted that fact multiple times at trial below as well. Let me direct your attention, this is Robin Rosenbaum, let me direct your attention for a moment to the motion to dismiss if I could. With respect to you know as you as you may recall there are several allegations for which the district court concluded a qualified privilege applied but with respect specifically to the Bulletin allegation and the Wells Fargo Bank and Federal Bank Association allegation it seems to me yeah I'm sorry can you hear me? Yes I'm sorry this is Joe Perkins I was disconnected from from a call in the middle of arguments my apologies your honor. That's okay this is Robin Rosenbaum and I have a question concerning the motion to dismiss. With respect to the as you may recall Kaplan argued that the complaint alleged malice or the lack of good faith and the district court dismissed the claims with respect to the well with respect to all of the allegations concerning the Bulletin allegation the Wells Fargo and Federal Bankers Association allegation with respect to the Bulletin allegation and the Wells Fargo and Federal Bankers Association allegations the issue there was whether the complaint alleged good faith and my that regions made the Bulletin allegation and the Wells Fargo Bank and Federal Bankers Association allegation for an improper purpose and so it seems to me like that would be inconsistent with alleging that he was alleging that it was done in good faith so why isn't that an error? Because the qualified privilege is not forfeited judge if the if the communication serves a proper interest and here the allegations of Mr. Kaplan's own you know completing gave rise to that proper interest so regions had an interest as a bank to make the to communicate to the FDA regions had a legitimate banking interest so because that's the fact even if hostility existed qualified immunity would still apply. Thank you. The other questions that the court below answered that had no bearing on the ultimate claims were that first that there were non-Kaplan funds in the Smith advertising accounts but this has no Kaplan was check-kiting to fund the Smith advertising transactions because well first during every single the amount of funds in the Smith advertising account from other sources was de minimis compared to Mr. Kaplan's wires and during every single day of the kite period with one exception December 29 Mr. Kaplan's cover wires were necessary to enable Virginia to pay the So there are of course three bases giving rise to a duty to speak for a fraudulent concealment claim. Here the court... Mr. Parkins you can you can continue for about a minute more since you were interrupted but but do bring it to a close here. Thank you judge. So to bring it to a close one the whether a duty arose because of a misleading partial disclosure a disclosure failure to disclose that he was leveraging the flow failure to disclose even constructively that the predicate of his investments was insufficient funds in the bridging account. The court also in question number four of the first page of the findings the court asked identified as a the kite collapse although she identified that as a material issue although she made a finding of facts that Mr. Kaplan identified that diverted 1.4 million dollars that from checks that were deposited into the region's account to another account. The court never tied them together and the court ignored another eight hundred four thousand that was diverted into the Kaplan entity's account. Okay all right Mr. Parkins you've saved you Mr. Weyrich. Good morning your honors this is attorney Jonathan Weyrich. May it please the court I'm here on behalf of the appellees cross appellants Marvin Kaplan, R1A Palms, Triple Net Exchange, BNK Smith and NK Investing LLC. For the sake of clarity I'll be referring to the various Kaplan entities by their abbreviated names as used throughout the briefing. Your honors I'd like to address a couple of the points that Mr. Perkins had made in his argument just now and also that keeps coming up in these briefings and the most significant one is that the the court's findings with respect to Mr. Kaplan's knowledge of what was going on were entirely consistent with his testimony and also with third-party corroborative evidence as to what was going on here. I know that the court is familiar with the background of this case but it bears mentioning again that while all this was ongoing there was a significant federal investigation of all of these issues. In fact it became part of the record both being read into the record and being entered in as an exhibit the indictment against the Smiths as well as the statements of various confidential informants. The FBI also and Secret Service also provided substantial information about their investigation which included the very transactions that are at issue here. All of that is found in docket number 774-11 where the relevant portions were in fact read into the record but turning to the turning to the idea that these deals were always conditioned on there being insufficient funds in the Smith account Mr. Kaplan never admitted that there was going to be a float leveraging at that time. In fact the very testimony that is cited to by Regions Bank does not support that he was admitting that. In fact later on in that testimony and I'm referring to I believe it's 774-6 starting on page 148 and forward Mr. Kaplan expressly testified that at no time while these transactions were going on did he think that these funds were not in the Smith account were available once he cashed the checks and deposited them and I'd have the court recall that the testimony throughout the proceeding was that SAA would reach out to him to go in on these print deals as 50-50 investors meaning that if Kaplan wired up ten million dollars for example the expectation was that the deals were combined for twenty therefore SAA would have to have at least ten million dollars already in its account to act on the deals. If Kaplan was getting called the night before by Smith asking for more funds which is what was occurring the expectation was certainly that SAA already had the money to pony up its end of the deal the next day and that's well before new client payments were coming in. Counselor, doesn't Mr. Perkins point to the email that was sent by one of the SAA principals that was eventually forwarded or shared with Mr. Kaplan that stated that they didn't have the funds in order to do this and they needed the funds and yet checks were sent by FedEx or overnighted or even flown on a private jet down to Mr. Kaplan in advance of wiring that money. So wasn't there the knowledge that there was insufficient funds before the wires were sent yet checks were in hand? No your honor and I think the district court correctly found that in this particular instance there's a difference in a distinction between saying I have a negative account balance or I have zero funds in my account to do this deal or I just need the additional money because of my other expenses and other overages. The bottom line here is that Mr. Kaplan would not have had any way of knowing what was going on in the Smith operating account. In fact the testimony and evidence that was received was consistent with the fact that the Smith had a number of other deals going on with a number of other investors. In fact returning back to docket 774-11 the FBI and Secret Service detailed a number of multi-million dollar transactions that were ongoing at the same time that Mr. Kaplan's transactions were ongoing. Well just because the FAA and their principals were fraudsters doesn't mean that this wasn't a fraud but isn't your best argument that there are two ways to read it that email one being that there was insufficient funds the other being that that they needed a partner in order to exploit these discounts and Mr. Kaplan based on his long-standing relationship thought it was the latter rather than the former and the district court credited that inference. I mean isn't that the real argument? Your honor I think you're absolutely correct. I mean at most what we have here are two viewpoints on the evidence of trial. At best you have the Kaplan view which is obviously that you know he felt that these were legitimate deals that Mr. Smith was reaching out to him for the purpose of capitalizing on some things but he didn't know what was going on what what the extent was of their investments and then there's a region side of it. The district court sided with Mr. Kaplan finding him to be a more credible witness and and she the judge below found that the evidence was more in support of Mr. Kaplan's position and that actually does go to whether or not you know this issue merits reversal. The mere disagreement or a conclusion you know by the reviewing court that maybe the evidence should have gone one way or the other is not enough. There must be some sort of manifest and clear error on behalf of the district court and I believe your point is well taken your honor. In this case at best there can be two views of the evidence but the district court ultimately found that Mr. basis for reversal. So I'd also like to point out in as my time I believe is running up here that despite all of the mountains of evidence that regions claims to have against Mr. Kaplan on on these issues the real the real issue for for regions is that it's up against its own mountain. What regions regions position at trial which was rejected by the district court was that every person third party who ever looked into this case including the FBI, the Secret Service, the US Attorney, federal investigators completely missed that Mr. Kaplan was in fact the principal co-conspirator with SAA and and of course that's not the case. Mr. Kaplan was always labeled a victim in fact for the very same transactions that are here and in fact regions was labeled a victim for the same transactions as well. I'd like to also comment very briefly before I conclude to judge Rosenbaum's question with regard to the defamation issue. Your honor I believe that on the the motion to dismiss qualified immunity and absolute immunity would not have applied to third-party statements. That's in addition to the third-party statements that were made not only to Wells Fargo Bank and the Florida Bankers Association but also to other third-party individuals as was alleged in in both the original complaint paragraphs 155 and in the amended counterclaims at paragraphs 169 through 70. Those third party... Counsel doesn't reports to law enforcement specifically are included within the qualified immunity and under the under what we call the litigation privilege in Florida? They can be your honor however because it's qualified immunity there is an express malice exception to that and that's the question of fact that should not have been decided on a motion to dismiss basis. It's not a it's not something that could have been examined and reviewed on the face of the pleadings. Two minutes remaining. So in conclusion with respect to that issue there were a number of allegations... I don't see where the allegations that alleged that Regents and Shaw knew that Kaplan was engaged in check kiting as opposed to that they should have known. I'm sorry your honor could you clarify what... I don't see where the allegations of the complaint alleged that Regents and Shaw knew that Kaplan was not engaged in check kiting as opposed to that they should have known that and so I don't I don't see how you can satisfy express malice. Well your honor if you look to paragraph 170 of the amended counterclaim it states specifically that despite the fact that they had no evidence or backing to support such a claim Shaw and other representatives of Regents began to tell other third parties including Wells Fargo... Well that may be that they should have known that doesn't mean that they did know. The next paragraph your honor states that this accusation was blatantly false and was made with absolutely no knowledge or support by Shaw acting in his capacity as an employee of Regents. Shaw despite the fact that he should know better falsely accused not just Kaplan. That's just my point. I don't see where any of that alleges that they in fact knew. Well your honor that that may be an issue of fact that has to be examined later on through discovery. It has to be pleaded first. Understood your honor I see that my time has expired now so just briefly in conclusion the Kaplan parties are urging this court to rule in its favor in their favor on on all the issues on appeal. We believe that the district court correctly decided the issues at trial and Mr. Kaplan should be pleased the court. Jason Ellison for Bridgeview Bank Group. There are two categories of claims against Bridgeview Bank Group on appeal. The first is based in tort and the second is based in alleged violations of banking statutes. First as to the tort claims it's undisputed that there were no direct representations or misrepresentations to the Kaplan parties. Bridgeview Bank's sole involvement in this matter was through banking activities and because Bridgeview's exclusive involvement was through the processing of checks and rendering of routine banking services it's displaced all the claims the tort claims are displaced by the UCC. The exact actions the Kaplan entity to take issue with in their common law claims are covered by the UCC and therefore preempted. The conspiracy took place. In order for the Kaplan parties to establish a claim for conspiracy they would have to establish knowledge on behalf of Bridgeview Bank as well as an agreement to participate in a Ponzi scheme. The facts simply do not bear this out. All of the evidence all of the affidavits and declarations but even most importantly the expert reports and this includes the expert reports of the Kaplan parties which confirm that Bridgeview Bank did not violate any industry standard in its banking activities and through its routine banking services. Because Bridgeview didn't violate any industry standard it would defy logic for a bank to participate in a Ponzi scheme and because there's no knowledge or agreement the conspiracy claim fails. The next category of claim against Bridgeview involves the banking statutes and this stems from Bridgeview's use of the return designation refer to maker for returning checks in the first and second deal transactions. All of the expert reports agree that refer to maker was permitted by law at the time that it was used. All expert reports agree that refer to maker was appropriate in these circumstances and all the expert reports agree that no changes were made to the prior commentary and because no changes were made to the prior commentary the prior commentary remained the operative guidance was permitted by law and was therefore the district court opinion should be affirmed on these grounds. What about at the point when Bridgeview learned that the account was being used for improper purposes and shut down the account or at least had knowledge that it should be shut down but didn't until the 24th. What Why on January 13th was there a decision made to close the account due to a volume of increased wire transfers? That is the reason. The volume of increased wire transfers Bridgeview Bank became just uncomfortable with the amount of wire activity in the account that had increased. I think Mr. Perkins may have said that. So there was a red flag right? No judge not as far as any kind of fraud was concerned and that's one of the reasons that. Why is the bank closing a long-standing customers account with millions of dollars going in and out if there's not a red flag? Why would a bank do that? The bank was no longer comfortable with the amount of activity. Because there was a red flag right? No I don't believe so. I don't believe a bank is a bank can be uncomfortable with account activity with or without any kind of flag of any kind of improper activity going on. A bank can be uncomfortable with these. And Bridgeview had a policy of allowing on at least on a day-to-day basis an insufficiency as long as it was covered by by the time the midnight window closed right? Judge not this particular not an exclusive policy for this client this customer. Bridgeview had numerous customers which it would allow their business banking customers to cover daylight. So it had a policy allowing insufficiencies and on the 20th and on the 13th had some information for which it knew the account should be closed because of some problem with the judge. First of all it's not negligent because it those claims are displaced by the Uniform Commercial Code. But secondly the Uniform Commercial Code says anything about a policy to allow insufficiencies for over 24 hours and for not closing accounts. I don't think the UCC says anything about either of those things. Well the expert reports and the only expert report rendered in this case and the expert testimony of the Kaplan Party's expert says that the Kaplan Party's that Bridgeview Bank did not violate any industry standards. So in order to be negligent Bridgeview would have to violate some industry standard and in this instance they simply didn't do so. Okay we understand your argument counsel and well it's time for Mr. Perkins to give us a few minutes of rebuttal. Thank you judges just a few points. One the FBI never investigated a check type. The FBI investigated a Ponzi scheme and both Mr. Kaplan and Regents agree that the litigation in this case is not a Ponzi scheme case. I'm sorry counsel this is Robin Rosenbaum. If the FBI I mean generally as you know in order to obtain the best evidence that they can get the to indict or at least investigate everybody who they think is involved in the crime and then if they think that there is involvement they might press charges against them as well and try to flip them up against the other person. Isn't that true? I'm a civil litigator it sounds right to me but in this case this transfers that began on the day one of the kite rotation and ended every single day here and this is uncontributed evidence from an individual account perspective it hid the circular rotation of funds and Mr. Kaplan's only explanation for these transfers that the internal transfers that is was to consolidate wires to save money on wire fees but then we identified day after day Mr. Kaplan putting two three or four transfers so did the FBI not get wind of the check plate that's what it seems like but Regents did in the case below and FBI does regularly investigate and bring to the grand jury charges of check kiting in other cases doesn't it? Sure I wish I wish they did in this case but the investigation of a Ponzi scheme which seems like it existed doesn't change the fact that Mr. Kaplan invested Mr. Kaplan floated checks to invest in what ultimately turned out to be a Ponzi scheme and the Ponzi scheme turned into a Ponzi scheme. Okay. Do you have anything more Mr. Perkins? Go ahead Mr. Perkins. Wrap it up. Yes Judges. So the email in addition to Mr. Kaplan's express acknowledgment that insufficient funds in the bank account was the predicate for these deals the email from Todd Smith with the first kite rotation is very express it says I will send you my checks tomorrow you can cash my checks tomorrow morning but my customer at the same time you send the wire but my customer payment will not post until later in the day. Mr. Kaplan didn't need to know. Counsel your time has expired. Okay Mr. Perkins we understand your case and have it under submission and thank you for your argument.